**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Cr. No. 25-432 (2) (DWF/ECW)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ISIAH ANGELO GARCIA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **DEFENDANT'S POSITION REGARDING SENTENCING AND MEMORANDUM IN SUPPORT OF A GUIDELINE SENTENCE** |

**Introduction**

Mr. Garcia respectfully requests a guideline 135 month federal sentence. He submits this case is tragic and caused tremendous harm to the victims. He has never denied that fact, nor stated any position contrary to it. However, he has virtually no criminal history, no history of assault, kidnapping or other violent conduct. Rather than proceed with a trial, Mr. Garcia quickly accepted responsibility and has expressed remorse for his conduct.

What is striking about Mr. Garcia's case is not merely what the record reveals, but what remains unexplained. What would lead a man with no criminal history to engage in conduct so profoundly inconsistent with his past? And, once apprehended, why would he decline to provide information that could substantially improve his position at sentencing—including information concerning the "third party" and the location of approximately $8 million in cryptocurrency?

The government will likely attribute his conduct to greed. But greed alone does not readily explain his apparent unwillingness to use that information for his own benefit. From the defense perspective, fear offers a more plausible explanation—both for his involvement in this case and for his subsequent silence.

Nor does the manner in which this offense was planned and carried out support the characterization of Mr. Garcia as a criminal mastermind. To the contrary, the conspicuous lack of sophistication in its planning and execution is difficult to reconcile with the notion that he independently, or with the co-defendant or the "third party," conceived, coordinated, and directed a scheme of this magnitude. His lack of criminal history suggests he has absolutely no experience in such endeavors.

Given that lack of criminal history and quick acceptance of responsibility, and for the reasons discussed below, Isiah Garcia asks the Court to impose a guideline sentence of 135 months imprisonment followed by three years of supervised release. That request is the bottom range for the plea agreement's 135 to 168 month calculation, yet below Probation's disputed 168–210 calculated month range.[1] Mr. Garcia respectfully requests this substantial prison sentence of 135 months because an armed home invasion, restraint of three people, abduction, and theft of millions in crypto-currency requires serious punishment, and that is what this 25-year-old young man is asking for. He is not requesting a variance, unless the Court should conclude that probation's calculations are correct.

Mr. Garcia was 24 when he committed the offense and had never been detained before this case. His only prior conviction resulted in a fine. As stated, he timely admitted his role in the robbery and abduction and declined to provide what would have been self-serving information with the government. Sherburne county jail records confirm his proactive educational and reentry work during this first incarceration. Importantly his family offers him a place to return, and his reported trade experience gives him a basis for lawful employment when he is released.[2] Those facts of course do not erase the very serious offense. But they do support

[1] Plea Agreement ¶ 7(f); PSR ¶¶ 67, 70.
[2] PSR at F.2; ¶¶ 18–19, 35, 46–47, 57, 60–62, 87.

a sentence of 135 months that holds him accountable while giving him a real opportunity to mature, develop better habits, and return to lawful work after a lengthy 135-month prison sentence.

It is important to note to the Court, that the undersigned's contact with Mr. Garcia has been pleasant, kind and respectful. Despite his difficult incarcerated circumstances in Sherburne County, he always seems to have a smile on his face and a pleasant demeanor. Mr. Garcia is a soft-spoken and shy young man, and his account to the undersigned adds details that the PSR did not convey: feeling abandoned when his father was suddenly deported from the United States when he was a young child, struggling to read and retain information, and being embarrassed and bullied over his learning needs and special education requirements growing up. He described to the undersigned his thinking about the harm he caused to the victims every morning and every night. And describes that after prison, he plans on living with his mother, returning to plumbing, and pursuing further trade training. These facts give the Court a fuller picture of both his difficulties and the practical work needed for change.

This position does not ask the Court to undermine the terrible facts in this case. The crime involved planning, firearms, multiple victims, and travel to another location. While in custody, the PSR documents lockdown-related violations and a disrespectful comment to staff.[3] What the PSR does not specify is that this disrespectful comment came after he witnessed jail guards strangling his brother, with their hands around his neck, and he was scarred and worried for his brother's safety. He acted out of impulse. Mr. Garcia asks the Court to assess the institutional record honestly alongside the educational work and personal history discussed below.

[3] PSR ¶¶ 9–15, 40, 86–87.

Taken together, a 135-month prison term, tailored supervision, and the court ordered restitution obligation are sufficient without being greater than necessary under 18 U.S.C. § 3553(a). His timely guilty plea resolved this federal case without a contested hearing, and what would have been an emotional and difficult trial for the victims and their family. The Court should weigh that choice, his quick acceptance of responsibility, and its significance for the victims together with his personal remorse, family support and documented educational work.[4]

## I. Legal Standard and the Applicable Guidelines Framework.

The Court must calculate the advisory range correctly, consider the parties' arguments, and decide the appropriate sentence for Mr. Garcia under § 3553(a). It may not assume that a sentence within the range is reasonable. A substantial variance, which is not being requested here unless the Court finds the PSR calculations correct, requires a substantial explanation tied to the facts of the case. It does not require extraordinary circumstances or a rigid mathematical formula.[5] The defense therefore addresses the correct calculation and explains why the requested 135-month sentence is appropriate *even if* the Court adopts Probation's range in the PSR.

The law also allows the Court to consider Mr. Garcia's full background and conduct.[6] *Pepper* emphasizes sentencing based on the individual and the value of rehabilitation in assessing future conduct.[7] Although *Pepper* involved post sentencing rehabilitation at resentencing, its reasoning supports considering Mr. Garcia's documented efforts while in custody in Sherburne County before sentencing, and his young life-long behavior in engaging in any such similar conduct.

---

[4] Plea Agreement ¶¶ 2, 7(d); PSR ¶¶ 2, 19, 57.
[5] *Gall v. United States*, 552 U.S. 38, 49–51 (2007); *United States v. Feemster*, 572 F.3d 455, 461–62 (8th Cir. 2009) (en banc).
[6] 18 U.S.C. § 3661.
[7] *Pepper v. United States*, 562 U.S. 476, 487–93 (2011).

## II. The Plea Agreement, Penalties, and the Advisory Calculations.

### A. Count 2 carries no mandatory minimum and a twenty-year maximum.

On June 18, 2026, Mr. Garcia pled guilty to Count 2, interference with commerce by robbery, in violation of 18 U.S.C. § 1951.[8] The agreement requires the government to move to dismiss any remaining counts against him when sentence is imposed.[9] Count 2 carries no statutory mandatory minimum and a maximum of twenty years.[10] The maximum term of supervised release is three years, as paragraph 6(b) states.[11]

### B. The parties agreed to the offense-level calculation.

| **Calculation** | **Plea agreement**[12] | **PSR** |
|---|---|---|
| Base offense level (§ 2B3.1(a)) | 20 | 20 |
| Firearm (§ 2B3.1(b)(2)(B)) | +6 | +6 |
| Abduction (§ 2B3.1(b)(4)) | +4 | +4 |
| Loss (§ 2B3.1(b)(7)(G)) | +6 | +6 |
| Physical restraint (§ 3A1.3) | — | +2 |
| Acceptance (§ 3E1.1(a), (b)) | −3 | −3 |
| **Total offense level / criminal history** | **33 / I** | **35 / I** |
| **Advisory imprisonment range** | **135–168 months** | **168–210 months** |

While the plea agreement is binding on the parties but not the Court, defense counsel respectfully notes to the Court, that the parties took much time and effort in negotiating an agreement that was acceptable to Mr. Garcia and the government. Paragraph 7(f) cites the agreed guideline range, and the agreement is also clear about the disputed adjustment. Paragraph

[8] PSR ¶ 2; Plea Agreement ¶ 1.
[9] Plea Agreement ¶ 1.
[10] 18 U.S.C. § 1951(a); Plea Agreement ¶ 6(a).
[11] 18 U.S.C. §§ 3559(a)(3), 3583(b)(2).
[12] Plea Agreement ¶ 7(a)–(f). Category I is expressly a belief, not a stipulation. ¶ 7(e). PSR calculations: ¶¶ 20–31, 36, 67, 70. The third acceptance level requires the government's motion under § 3E1.1(b). PSR ¶ 19.

7(b) identifies the firearm, abduction, and loss increases and states that no other specific offense characteristics apply. Paragraph 7(c) separately provides: "The parties agree that, other than acceptance of responsibility, no other Chapter 3 adjustments apply." Section 3A1.3 is a Chapter 3 adjustment. The only offense-level difference in defense counsel's chart above is Probation's addition of those two levels, and defense counsel and the government agreed in the plea agreement that no such adjustment applies.

## III. Preserved PSR Objection.

### A. The physical-restraint objection.

Mr. Garcia maintains the objection summarized at PSR Addendum A.2, supported by paragraph 7(c)'s express exclusion of additional Chapter 3 adjustments. He also argues under the Guidelines that § 2B3.1(b)(4) provides alternative increases for abduction or physical restraint, while Application Note 2 to § 3A1.3 instructs courts not to apply that adjustment when the offense guideline specifically incorporates restraint. The defense argues that adding the Chapter 3 adjustment to the combined restraint-and-abduction conduct bypasses that limitation. It asks, under the plea agreement, the Court to apply offense level 33.

The defense recognizes the difficulty presented by *United States v. Strong*.[13] *Strong* permitted abduction and restraint increases when they were based on separate conduct and separate harms. That case involved § 2A3.1, not the robbery guideline's express choice between the two increases. *United States v. Czarnecki* applied *Strong* in a carjacking case and likewise upheld increases based on separate facts.[14] Under these decisions, calling all the events a single robbery is not enough.

[13] *United States v. Strong*, 826 F.3d 1109, 1116–17 (8th Cir. 2016).
[14] *United States v. Czarnecki*, 788 F. App'x 1043 (8th Cir. 2019) (per curiam) (unpublished).

Probation identifies the initial use of zip ties on three victims separately from the later abduction of Victim 1 to the cabin.[15] Mr. Garcia does not deny those facts; however those facts were intimately tied to the original robbery and part of the same overall and joint plan in this case. It was over the course of the same time period, involved the same people, and same criminal conduct. It was not two separate robberies but rather one single robbery that was tied to the initial conduct and purpose of the crime. He maintains his objection based on the guidelines' text and asks the Court to determine that those facts do not permit both adjustments under the applicable provisions and *Strong*, resulting in the offense level agreed to by Mr. Garcia and the government.

**B. The addendum's level-38 range is incorrect.**

Addendum A.3 refers to "38/I: 235 to 293 months" is incorrect and will be corrected based on defense counsel's conversation with probation.

## IV. The Offense and Acceptance of Responsibility.

**A. Mr. Garcia's admissions and remorse recognize the victims' harm.**

Paragraph 2 of the plea agreement establishes that Mr. Garcia and his brother kidnapped and held three people at gunpoint, demanded cryptocurrency transfers, and stole millions in crypto funds. It also admits that Mr. Garcia forced Victim 1 to drive him to the cabin and make further transfers at gunpoint.[16] This was not an ordinary theft. The planning, weapons, physical restraints, and multiple victims make the offense extremely serious, and Mr. Garcia has acknowledged that, which is why he submits a guideline 135-month sentence is fair to both him and the government.[17]

---

[15] PSR ¶ 24; PSR Add. at A.2.
[16] Plea Agreement ¶ 2, p. 2; PSR ¶¶ 9–11, 18; Acceptance of Responsibility Statement at 1–2.
[17] PSR ¶¶ 9, 13–15, 86–87.

Mr. Garcia recognizes that the victims suffered significant psychological and financial harm. Mr. Garcia early on admitted his very poor decision making in this case to the undersigned, and the impact it must have and still does have on the victims. He was clear since the beginning of this case, to defense counsel, that he did not want to go to trial and wanted to accept responsibility and resolve the case. Paragraph 12 sets restitution at $8,431,112.97 to Victim 1, jointly and severally, and permits additional restitution for additional losses identified at sentencing. Mr. Garcia's request for a guideline sentence does not minimize that harm. The lack of an injury enhancement does not underplay the suffering of the victims, although it should be noted in this case.

Mr. Garcia's statement directly acknowledges his conduct: "*I abducted Victim 1. I compelled Victim 1 to drive to the cabin*."[18] He also admits forcing additional crypto transfers at gunpoint and using a firearm to convey a specific threat and make physical contact.[19] He admits his own serious conduct rather than minimizing himself as a bystander during the crime, or what may have been other defenses at trial; i.e., he was forced to do it by another person or unlawful organization. The PSR finds that the acceptance reduction is appropriate and that an additional level is appropriate upon the government's motion.[20]

His communications to defense counsel also address the people he harmed. He reports thinking about the victims when he wakes up every morning, when he goes to bed every evening and expresses wanting to apologize for the emotional and mental harm he caused. In discussing his deepest regret, he told the undersigned that "I think about the impact it had on them every day." He also said to defense counsel on multiple occasions that, "I am sure that September 19th

---

[18] Acceptance of Responsibility Statement at 1.
[19] Acceptance of Responsibility Statement at 1–2; Plea Agreement ¶ 2, p. 2.
[20] PSR ¶ 19.

is a very difficult day for them." Those words focus on the victims' continuing suffering experience. These repeated acknowledgements supplement his formal admission and demonstrate to the undersigned Mr. Garcia's daily regret for his actions in this case.

He describes the crime as the worst decision of his life and says he wants to learn from his mistakes and make amends to the best of his abilities.

The Court should consider that acknowledgment alongside Mr. Garcia's educational efforts when assessing his prospects for lawful conduct when he is released from prison, which will be long time from today. It is significant that Mr. Garcia, only 25 years old, is asking the court to execute a sentence that will make him a federal prisoner until he is over 36 years old. If the Court finds probations calculations to be correct, the variance request does not rely only on the acceptance adjustment already included in the calculation.[21] Although the PSR describes instructions from an *unidentified third party*, the defense does not deny Mr. Garcia's admitted actions or request a § 3B1.2 mitigating-role adjustment contrary to paragraph 7(c).[22] His individual characteristics matter to the separate § 3553(a) analysis. They are not offered to portray an armed abductor as a passive participant, or perhaps "ordered" participant, which could have been his position in this case at the jury trial.

When asked why he participated, Mr. Garcia was mostly silent to the PSR writer, for reasons the undersigned suspects are because he was scared, and has been *ordered* not to speak. As stated, much is left unsaid about the circumstance in this offense, about who the ringleader was, and about what compelled Mr. Garcia not to disclose his knowledge as to the third person involved or information about the stolen crypto. Defense counsel speculates, because he was scared, Mr. Garcia remained silent as to these unknown matters. The defense does not offer a

[21] *See Pepper*, 562 U.S. at 487–93.
[22] PSR ¶¶ 10, 18, 25.

duress claim or seek to undo his admissions to any degree. But it is relevant that much is unknown to all parties in this case about what really happened and Mr. Garcia's situation prior to what happened on the date of the offense. Defense counsel can only speculate on why Mr. Garcia did not use information that would have obviously benefited him to negotiate a better plea agreement for himself.

**B. Mr. Garcia's timely plea avoided a trial and its additional burdens.**

Mr. Garcia pled guilty on June 18, 2026, and Probation received his written acceptance statement on July 16, 2026. The government expressly acknowledges in paragraph 7(d) that he "timely notified" it of his intention to plead guilty and agrees, subject to the stated conditions, to recommend the additional acceptance level. The defense relies on that documented timely resolution—not a claim that he confessed at arrest or pled guilty at the first possible opportunity.[23]

Section 3E1.1(b) expressly recognizes the value of timely notice that allows the government to avoid trial preparation and permits efficient use of government and Court resources. Its commentary makes timeliness context specific. Here, the government's acknowledgment supports giving weight to the plea's practical value. The defense does not claim that no investigative or trial preparation work had already occurred, but points the timely acceptance with Mr. Garcia was to the benefit of all parties involved.[24]

The Supreme Court has recognized that voluntary guilty pleas can conserve judicial and prosecutorial resources and reflect a willingness to admit wrongdoing and begin rehabilitation. *Brady v. United States* supplies that general principle; it does not prescribe a particular sentencing reduction. The defense seeks recognition of Mr. Garcia's affirmative and quick

---

[23] PSR ¶¶ 2, 18–19; Plea Agreement ¶ 7(d).
[24] U.S.S.G. § 3E1.1(b), cmt. n.6; Plea Agreement ¶ 7(d).

acceptance because that is what he chose to do, rather than put the government, the Court and most importantly the victims through a long, painful and difficult trial.[25]

As stated, the plea's significance is also beneficial to the people harmed. The events Mr. Garcia admitted to—guns in the home, restraint, and forcing Victim 1 to travel to the cabin—are the events the victims could have been called to recount under examination and cross-examination at his trial. By admitting his guilt, Mr. Garcia removed that burden. The defense submits that avoiding this additional burden deserves weight, especially alongside his account of thinking daily about the victims' continuing suffering and his sincere remorse. That is a reason to consider his acceptance beyond its numerical effect, not a reason to minimize the crime.[26]

The Department of Justice's published plea guidance likewise identifies effects on witnesses, trial expense, remorse, and victims' interests as relevant considerations. It recognizes both the possible burdens of appearing at trial and the fact that victims may differ in their views of a plea.[27]

## V. Mr. Garcia's Individual Characteristics Support a 135-Month Sentence, Even if the Court Finds Probation's Calculations Appropriate.

### A. Mr. Garcia's youth is relevant in conjunction with concrete opportunities for change.

Mr. Garcia was 24 when he committed the offense and is 25 at sentencing.[28] He was an adult responsible for his decisions. But the Court may distinguish a young adult's ability to change from the continued offending of an older person who has repeatedly been imprisoned. As stated, Mr. Garcia has never been charged with a felony or gone to prison. Here, his age is

[25] *Brady v. United States*, 397 U.S. 742, 752–53 (1970) (discussing the legitimate benefits of voluntary guilty pleas).
[26] Plea Agreement ¶¶ 2, 4; PSR ¶¶ 9–11, 18.
[27] U.S. Dep't of Justice, *Justice Manual* § 9-27.420, considerations 4–5, 7, 10, 12 & comments 5, 7, 10, 12 (published text, accessed Sept. 25, 2026); id. § 9-27.150 (internal guidance; no enforceable rights).
[28] PSR at F.2; ¶ 85.

especially relevant when combined with his limited prior record, first detention, continuing family relationships, and trade experience. It is that combination—not an automatic discount for everyone under 25—that supports the request.

Mr. Garcia's account to the undersigned also gives specific meaning to his difficult childhood. He describes trying to fit in, seeking approval, and finding it difficult to say "no" when others encouraged him to leave school and make other bad decisions. His mother describes being *shocked* at these charges, as he has never been in trouble with the law, and described him as quiet growing up and a follower in his social circle..[29]

The Commission's 2024 revision to § 5H1.1 recognized youth at the time of the offense as a possible basis for departure and discussed development into the mid-twenties, environmental risk factors, and protective factors supporting rehabilitation.[30] That history remains useful to the § 3553(a) analysis (if used here) even though the ordinary departure provision was removed from the 2025 Manual. It generally states that age may be relevant in determining whether a departure is warranted, removing previous restrictive language that required age considerations to be present to an "unusual degree." The policy text explicitly recognizes that cognitive brain development continues into the mid-20s, making youthful individuals more impulsive, risk-seeking, and susceptible to outside influence, while also making them more amenable to rehabilitation. It also incorporates the criminological concept of the "age-crime curve," indicating that criminal behavior naturally tends to decrease with age.

---

[29] PSR ¶ 46 (mother's description).

[30] U.S.S.G. § 5H1.1 (2024); app. C, amend. 829 (The U.S. Sentencing Commission updated § 5H1.1 to explicitly allow for a downward departure due to a defendant's youthfulness at the time of the offense or prior offenses (noting developmental factors, impulsivity, and high amenability to rehabilitation into the mid-20s)).

Because this offense involved planning, it cannot fairly be described as purely impulsive.[31] No one knows in this case who really planned it, but the fact Mr. Garcia has remained silent about nearly everything in this case creates suspicions. 11.25 years in a federal prison, for a 25-year-old young man, is a meaningful portion of his young adulthood, and three years of supervision following that lengthy prison sentence would provide structure during that transition back into society.

### B. Mr. Garcia has no prior record.

The PSR identifies no juvenile adjudications and only one adult conviction: the drug-paraphernalia misdemeanor punished by a fine.[32] It states that he had never been detained before this case.[33] Thus, a substantial prison term is a new form of punishment for Mr. Garcia. His lack of history matters when the Court decides the length of his first prison term.

The pending Texas charge and the Minnesota charges must also be described accurately. The Minnesota allegations arise from the same conduct as the federal prosecution; the Texas matter is separate.[34] The defense does not ask the Court to ignore reliable information about either matter, but those pending charges should not be treated as prior violent convictions or as proof that imprisonment failed to deter him.

### C. Mr. Garcia's educational and attention-related mental health history supports assessment and structure.

Mr. Garcia's mother reported special-education services from middle school through high school. Mr. Garcia explained to the undersigned that he struggled with reading, comprehension, and processing information. He remembers being unable to repeat back information he had just

[31] PSR ¶ 87.
[32] PSR ¶¶ 33–36.
[33] PSR ¶ 87.
[34] PSR ¶¶ 38–39.

learned, receiving help from special teachers, feeling embarrassed, and being teased and bullied over those difficulties. This account gives substance to a history that caused him trouble and anxiety with his friends and family. His history with his learning disabilities caused him shame, ridicule and embarrassment.

The PSR also reports A and B grades and a verified high-school diploma. It records a reported ADHD diagnosis during sixth grade, but no clinical assessment of his mother's suggestion that he might be on the autism spectrum.[35] The defense of course does not turn Mr. Garcia's recollections to defense counsel into a new diagnosis suggestion, an intellectual-disability finding, or evidence that a disorder caused this offense, but offers it only as mitigating information in conjuncture with defense counsel's suspicion that Mr. Garcia was unable to say "no" to whoever supplied his instructions in this case, and defense counsel's suspicion that this was not a planned event by "Mr. Garcia" himself. His reported learning needs should be considered as he needed specialized help to achieve his education, and that he spent a great deal of time in "special education" classes with "special education" teachers. He also recalls to the undersigned that he stopped his prescribed medication because it made him feel spaced out and disconnected.

The PSR reports cannabis use before his arrest and no prior substance-use programming.[36] Mr. Garcia stated to the undersigned that he used marijuana because of anxiety, is willing to stop using it entirely and has in fact been 100% sober since his incarceration. His explanation does not establish an anxiety disorder or a medical need for marijuana, but shows he has struggled with it to some degree. It supports assessing his needs and addressing substance

[35] PSR ¶¶ 46, 49, 55.
[36] PSR ¶¶ 53–54.

use, and his willingness to abstain is a commitment to be tested through conduct and supervision. The request is for appropriate care and accessible programming, during and after prison.[37]

**D. Mr. Garcia's verified educational work deserves weight despite his custodial infractions.**

Jail records reviewed by Probation confirm that Mr. Garcia completed 67 hour-long educational sessions, a Rising Stars Reentry Program, and a high-school-equivalency study program.[38] His high-school diploma is separately verified.[39] Despite having completed high school with his special education requirements, he continued using the educational opportunities available in custody. He has made a sincere effort to keep learning in custody, rather than simply promising to do so after release.

He describes to the undersigned what those sessions meant to him: lessons about health, the effects of alcohol and drugs, preparing for release after his lengthy sentence, and making better decisions instead of simply doing what other people tell him to do. The connection to his stated intellectual difficulties is concrete. The decision-making lessons he is attempting to learn address the approval-seeking from others he describes and the substance-use lessons relate to his reported marijuana use to treat his anxiety.

**E. Childhood separation, family support, and trade skills give context and a path forward.**

Mr. Garcia informed the undersigned that he remembers being about ten years old when his father was deported from the United States. He recalls he did not understand what was happening, felt devastated and abandoned, and has not seen his father *in person* since. He recalls first speaking with him again during high school and describes little meaningful contact now,

[37] *Tapia*, 564 U.S. at 334–35.
[38] PSR ¶ 57.
[39] PSR ¶ 55.

especially after his father started another family in Belize.[40] His account describes the sudden and dramatic loss of a parent from a child's daily life, and the way one experienced that loss as a child. His father abandoned him at a time he most needed him.

That account differs slightly from the PSR's description of a close relationship and regular contact with his father before arrest.[41] The defense does not ask the Court to treat the newer account to defense counsel as an established correction. The shared fact is the father's sudden departure during childhood; Mr. Garcia's present account to the undersigned adds how he remembers experiencing it. The PSR also describes a safe early home and no reported physical or sexual abuse.[42] What is relevant is the significance of childhood separation and abandonment alongside the learning and social difficulties he describes without a father to guide him through such difficult childhood experiences. He was bullied for his learning disabilities, and did not have a father to support him.

Mr. Garcia's mother remains the central support in his proposed return home after serving his lengthy sentence. She offered him a place to live, and he continues to plan on returning there when he is released from his prison sentence.[43] He wants to contribute rent, do chores, and use his plumbing and other skills to help maintain the home. That is a concrete starting point for a young man facing such a long sentence at 25 years old. He has no children or dependents; the request is based on family support.[44]

He also describes the pain of being unable to help his mother and reports to the undersigned that people in their community have harassed and bullied his mother and younger

[40] PSR ¶¶ 42, 85 place the separation around 2011 and describe him as eleven. The precise age is not resolved by the interview summary.
[41] PSR ¶ 42 (the PSR describes a close relationship and once- or twice-weekly contact before arrest)
[42] PSR ¶¶ 42, 44.
[43] PSR ¶¶ 46–47.
[44] PSR at F.2; ¶ 45.

sister because of this pending federal case. These reports are not meant, in any way, to be a comparison for the victims' harm, but they are significant in that his family has suffered as well, yet despite this harassment from the local community, they support him. They help explain his stated wish to return as someone who contributes to his household rather than causes it further harm.

The PSR records self-reported work in plumbing, landscaping, fence work, and air-conditioning equipment installation.[45] It also reports an expired plumbing license and termination from one job for habitual tardiness.[46] Mr. Garcia now attributes the attendance problem to incorrect timecard entries.

His employment goals are specific. He wants to renew his plumbing license, work in plumbing and sprinkler systems, and pursue a backflow-related credential. He intends to work for an employer before eventually seeking to operate his own business. During imprisonment, he hopes to pursue available electrical, HVAC, and other trade training.

He identifies to the undersigned Wayne, a friend who owns a plumbing company, and another contact, John, as people who may help him find a path back to work. He also hopes to reconnect with Mr. Jackson, a former church mentor, and describes regular church attendance as a positive part of his earlier life. His proposed plan is to pursue those contacts, obtain lawful work under supervision, contribute at home, and make restitution payments.

**F. The relevant question is the added value of additional imprisoned years beyond 135 months.**

The offense plainly requires both general and specific deterrence. A 135-month prison sentence clearly is sufficient for both. The need to deter Mr. Garcia must also be assessed

---

[45] PSR ¶¶ 60–62.
[46] PSR ¶¶ 56, 61.

against his actual history: the prior fine, or course, did not expose him to the loss of liberty he now faces.[47] The defense asks the Court to consider that the substantial 11.25 year prison term for a 25-year-old young man is sufficient. When asked what a 11.25 year prison term would mean to him, Mr. Garcia describes it as a long part of his young adulthood and says he wants to use that time to learn from his mistakes, improve himself, and make amends.

The National Institute of Justice's discussion of deterrence explains that the certainty of being caught has a stronger deterrent effect than increasing already lengthy prison terms.[48] That general research does not, or course, identify an exact sentence or an individual risk score for Mr. Garcia. It does support asking why this case requires more than a substantial prison sentence, rather than assuming that a longer sentence always produces proportionately greater deterrence.

**G. The aggregate guideline result warrants an independent proportionality assessment.**

Even without the contested restraint adjustment, the agreed calculation adds a significant sixteen levels to the base level for the firearm, abduction, and loss, before subtracting acceptance. That sixteen level increase is enormous to a 25-year old young man. The separate, *if necessary*, § 3553(a) question is whether the combined range adequately accounts for Mr. Garcia as an individual and his prospects after a substantial first-time-ever, 11 year, prison term. Paragraph 10 preserves that sentencing argument without altering the agreed enhancements.

If the Court applies the additional two levels, the bottom of the range rises from 135 to 168 months—a further 33 months.[49] The defense asks the Court not to let that disputed increase determine the overall sentence. If probation's calculated level is deemed appropriate, a

---

[47] PSR ¶¶ 35, 87.
[48] National Institute of Justice, *Five Things About Deterrence* (May 2016).
[49] PSR ¶¶ 2, 67.

variance/departure can account for the combined effect of a correctly calculated range without deleting an otherwise applicable enhancement or denying the additional harm to the victims.[50]

### H. Mr. Garcia's reported confinement conditions warrant individualized consideration of hard time.

Mr. Garcia reports that at Sherburne County Jail he spends 23 hours a day in his cell, with one hour out, no outdoor recreation or access to sunlight, and family contact limited to video rather than in-person visits. Defense counsels respectfully requests, as is common with nearly all Minnesota federal sentencing cases, a hard time consideration with his request for the 135-month guideline sentence.

In *United States v. Edmonds*, the Eighth Circuit described a District of Minnesota sentence that included a three-month reduction for pretrial "hard time," even though the overall sentence was above the advisory range. The court affirmed the sentence; it did not establish an automatic right to a reduction.[51] Mr. Garcia cites that example for individualized consideration under § 3553(a), not as a comparison between the underlying offenses or a request for the same number of months.

His present account does not establish when the restrictions described in the PSR began, whether they were continuous, or whether they resulted from discipline. Nor does the reported confinement erase the tablet-based education confirmed in the PSR.[52] The Court can give the conditions whatever weight the reliable record supports as part of the requested 135-month sentence.

---

[50] Defense counsel moves for a variance if probation's guideline recommendations are adopted.
[51] *United States v. Edmonds*, No. 18-2726, slip op. at 2 (8th Cir. Apr. 15, 2019) (reported at 920 F.3d 1212) (describing a three-month reduction for pretrial "hard time" within an otherwise above-Guidelines sentence); 18 U.S.C. §§ 3553(a), 3661.
[52] PSR ¶¶ 40, 57; U.S.S.G. § 6A1.3(a).

## VI. Why the Requested Sentence 135 Month Sentence is Sufficient.

Mr. Garcia's requested 135 month sentence is the bottom of the plea agreement's range, which rests on a combination: a substantial first incarceration; a limited prior conviction resulting in a fine; no criminal history; his young age at 24 when committing the offense; early childhood separation from his father; learning difficulties; harassment and bullying as a kid as a result of those disabilities; documented educational work; a timely guilty plea that avoided a contested hearing and federal trial; a more personal acknowledgment of the harm to the victims; his mother's housing offer and support; and specific trade and substance-use goals.[53] His reported confinement conditions provide an additional consideration to the extent established. None of those facts erase the planning, guns, restraint, abduction, or immense loss. Together, they support a sentence that punishes those acts with guideline sentence at the bottom of the plea agreement.

As to punishment and respect for law, 135 months is a substantial loss of freedom for a 25-year-old man serving his first prison term, and the court ordered restitution obligation as agreed to in the plea agreement recognizes the victims' loss that Mr. Garcia will likely be paying off for the rest of his life. As to public protection, his lengthy prison sentence is followed by supervision addressing firearms restrictions, lawful employment, financial transparency, victim protection, and assessed needs. As to rehabilitation, the Court can encourage education and treatment without adding additional prison time beyond 135 months for those purposes. As to restitution, a structured return to work allows payments sooner, although his current resources cannot satisfy the multimillion-dollar obligation.[54]

[53] PSR ¶¶ 35, 40, 46–47, 55, 57, 60–62, 87; See also Plea Agreement ¶¶ 2, 7(d); PSR ¶¶ 2, 18–19.
[54] PSR ¶¶ 63–65, 79; 18 U.S.C. § 3553(a)(2), (7).

His requested sentence request also addresses the problems identified in his account rather than relying on general assurances that he will do better. Learning difficulties call for assessment and understandable instruction. Reported marijuana use to address anxiety calls for assessment and a lawful response to those concerns. Work problems call for reliable attendance and timekeeping which can be learned in prison programming. Family and employment contacts offer a starting point for accountability. The defense submits that these focused measures, following 135 months in custody, provide a sounder basis for change than adding additional years in prison without addressing those needs.

## VII. The Request Sentencing Package

### A. Three years of individually tailored supervised release.

The defense requests three years of supervised release because the record shows a need for structure after prison: alleged compliance difficulties, employment needs, financial accountability, and victim protection.[55] This request is based on Mr. Garcia's needs and his position towards a respectful sentence, not an assumption that every prison term should be followed by the maximum term of supervision.[56] Appropriate conditions should include the mandatory requirements and tailored employment, financial-disclosure, restitution, and victim-contact protections. Any treatment condition should be based on an assessment of his needs, with the Court making the required sentencing decisions.

Paragraph 7(h) states an incorrect guidelines supervised-release term of "up to five years." As stated, that statement conflicts with paragraph 6(b)'s three-year statutory maximum

---

[55] PSR ¶¶ 40, 56, 61, 79, 90–93.
[56] *See* 18 U.S.C. § 3583(b)(2), (c), (d); U.S.S.G. §§ 5D1.1–5D1.2.

and with the applicable law for this Class C felony.[57] The Court should apply the lawful three-year maximum and choose the appropriate term based on Mr. Garcia's circumstances.

**B. Restitution, financial accountability, forfeiture, and no fine.**

Mr. Garcia requests the agreed restitution listed in the plea agreement to Victim 1, jointly and severally with his codefendant.[58]

Probation reports no assets or income, a negative net worth, and an inability to pay a fine given the restitution obligation.[59] Do to the fact that Mr. Garcia has no assets, defense counsel is a appointed CJA lawyer, he requests no fine and the mandatory $100 special assessment.[60]

**C. BOP recommendations and the proper treatment of custody credit.**

The defense requests recommendations for educational and mental-health or substance-use assessment and treatment. The defense also requests placement reasonably near his family support in Texas, consistent with BOP security and programming requirements. The PSR supports further trade training and confirms his educational work.[61]

Mr. Garcia has been detained since September 22, 2025.[62] The requested 135 months is the total term, not an additional 135 months beyond the sentencing date. BOP must calculate qualifying prior-custody credit under 18 U.S.C. § 3585(b), without double credit against another sentence.[63]

---

[57] 18 U.S.C. §§ 3559(a)(3), 3583(b)(2); U.S.S.G. § 5D1.2(a)(2); PSR ¶ 71.
[58] Plea Agreement ¶ 12; PSR ¶¶ 3, 16, 79.
[59] PSR ¶¶ 64–65.
[60] Plea Agreement ¶¶ 6(e), 11; U.S.S.G. § 5E1.2(a), (e); 18 U.S.C. § 3572(a)–(b).
[61] PSR ¶¶ 57, 88.
[62] PSR at F.1; ¶ 40.
[63] *United States v. Wilson*, 503 U.S. 329, 333–35 (1992).

**D. Avoiding duplicative punishment for the same conduct in Minnesota.**

The pending Minnesota case is the same offense conduct.[64] Defense counsel has conferred with the State County prosecutor responsible for the Minnesota State case and its disposition is pending based on the outcome of this federal case. Defense counsel understands that the plea agreement's opening paragraph binds only Mr. Garcia and the United States Attorney's Office for the District of Minnesota; it does not resolve those state charges. If the Court finds that an anticipated state sentence concerns relevant conduct to this federal offense, Mr. Garcia requests concurrency under U.S.S.G. § 5G1.3(c). The Court has authority to address an anticipated state sentence.[65] This request depends on that relevant-conduct finding and does not automatically include the separate Texas charge identified in the PSR.[66]

**Conclusion**

Mr. Garcia's offense calls for serious punishment, which he has respectfully requested. His detailed account to the undersigned also gives the Court reasons to look why a lengthy 135 month sentence is appropriate: a childhood marked by separation and abandonment from his father, reported learning struggles and special education necessities throughout his schooling, Mr. Garcia's young age, a timely plea resolving federal guilt without trial, thoughts and feelings about the victims' continuing harm, documented educational effort, and a plan to return to family support and lawful trade work. Those circumstances support accountability with a realistic opportunity for change. The defense also requests the PSR corrections and findings, BOP recommendations to Texas, conditional concurrency discussed above, and dismissal of the

[64] PSR ¶ 39.
[65] *Setser v. United States*, 566 U.S. 231, 236–37 (2012).
[66] PSR ¶ 38.

remaining counts against Mr. Garcia on the government's motion under paragraph 1. That sentence honors the plea agreement's terms and is sufficient, but not greater than necessary.

Respectfully submitted,

**RYAN GARRY, ATTORNEY, LLC**

Dated: October 19, 2026

/s/Ryan Garry
Ryan P. Garry (Attorney No. 0336129)
Attorneys for Defendant
333 South Seventh Street, Suite 2350
Minneapolis, MN 55402
Phone: (612) 436-3051
Fax: (612) 436-3052
ryan@ryangarry.com